IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,     )
                                     )
    Plaintiff,          )
                                     )   No. 08-20201 Ma/P
v.                         )
                                   )
BOBBY DEANGELO SMITH,      )
                                   )
    Defendant.          )

_____

REPORT AND RECOMMENDATION
_____

Before the court by order of reference is defendant Bobby DeAngelo Smith's Motion to Suppress Evidence, filed March 5, 2010. (D.E. 198.)  The United States ("government") filed a response in opposition on March 19, 2010.  On May 11, 2010, the court held a suppression hearing on the motion.  Present were Assistant U.S. Attorney Lorraine Craig, defendant Smith, and his attorney, Stephen Leffler.  At the hearing, the court heard testimony from Smith, U.S. Secret Service Agents William Jordon, Jeffrey Barker, and Patrick Davis, and Regina Hinton (Smith's girlfriend and co-defendant).  The court also admitted into evidence thirteen exhibits.[1]  At the request of the defendant, the court permitted

_____

[1]The exhibits consisted of Smith's rights waiver form signed June 3, 2008 (Ex. 1), Smith's written statement (Ex. 2), an inventory of evidence seized by Secret Service agents from the residence at 1763 Moryle #8 (Ex. 3), an inventory of personal property seized from Smith's person (Ex. 4), a copy of the apartment lease for 1763 Moryle #8 (Ex. 5), a consent to search form signed by Hinton (Ex.

the parties to file post-hearing briefs.

Based upon the briefs filed in support of and in opposition to the motion, the evidence presented at the hearing, the post-hearing briefs, and the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends that the Motion to Suppress be denied.

## I.  PROPOSED FINDINGS OF FACT

As Smith presented no witnesses to testify about the circumstances surrounding his arrest, his post-arrest statements, and the search of the apartment, the testimony presented by the government's witnesses stands uncontradicted.[2]  The court finds the testimony of the government's witnesses to be credible and accepts as fact the agents' version of events.

On June 3, 2008, at around 4:00 p.m., Secret Service Agent William Jordon received a telephone call from Terri Neyland, the

---

6), Hinton's rights waiver form signed June 3, 2008 (Ex. 7), Hinton's written statement (Ex. 8), a collection of photographs taken of the apartment during the search of 1763 Moryle #8 (Exs. 9, 10, 11), and two CD recordings of several telephone conversations between Smith, Hinton, and Dannette Ross (Smith's mother), which were recorded while Smith was being held in jail on these charges (Exs. 12, 13).

[2]Smith testified at the suppression hearing for the limited purpose of establishing his privacy interest in the apartment that was searched by the agents.  Although he briefly testified about his arrest in the Stein Mart parking lot, his testimony was not inconsistent with the agents' testimony.  Moreover, Smith did not testify about the events surrounding his post-arrest statements or the search of the apartment.  Smith called his co-defendant Hinton as a witness, but she invoked her Fifth Amendment rights and refused to answer any questions.

manager of the Casual Male clothing store located at 847 South White Station Road in Memphis, Tennessee.  Neyland told Agent Jordon that a man and woman had come into the store and attempted to purchase merchandise with counterfeit money, which Neyland rejected.  The couple then paid for the merchandise with genuine currency and left the store.  Neyland stated that she contacted the neighboring retail stores and learned that the same couple had attempted to pass counterfeit money at the nearby Stein Mart store, located at 827 South White Station Road.  Neyland also said that Stein Mart might have a videotape recording of the suspects.

Agent Jordon left his office (which happened to be located across the street from the Casual Male and Stein Mart stores) and drove towards Stein Mart.  On the way, Agent Jordon received a call from Amanda Swain, a loss-prevention employee of Stein Mart.  Swain stated that the couple had returned to Stein Mart to return merchandise they had previously purchased.[3]  Agent Jordon called other agents for assistance.  Shortly thereafter, Secret Service Agents Patrick Davis and David Stutheit arrived at the scene. While Agents Jordon and Stutheit waited in the parking lot, Agent Davis went inside Stein Mart to meet with store personnel and to determine whether the couple was still there.  Inside the store, a loss-prevention employee pointed out to Agent Davis the two

---

[3]The couple tried to purchase merchandise with counterfeit money at Stein Mart, which was rejected.  They then used genuine currency to make their purchase.

individuals (later identified as Bobby Smith and Regina Hinton) who had attempted to pass counterfeit.

Smith and Hinton left the store a few minutes later, followed by Agent Davis, who pointed them out to the other agents in the parking lot. Smith and Hinton then entered their car, at which time Agent Jordan pulled his car behind Smith's car and activated his emergency lights and siren. Smith was seated in the driver's seat and Hinton was in the front passenger's seat. Agent Davis approached Smith, drew his firearm, identified himself, and ordered Smith out of the car. Agent Davis asked Smith if he had any weapons on his person. Smith replied that he had a knife in his pants pocket. Agent Davis escorted him to the rear of the vehicle and asked Smith to place his hands on the back of the car. Agent Davis then pulled a four-inch long folding knife out of Smith's pants pocket. Agent Davis patted Smith's other pocket and pulled out a wad of cash. Agent Davis examined the cash briefly and handed it to Agent Jordon, who immediately determined that several of the bills were counterfeit.[4]

Smith was then placed in Agent Jordon's car. Agent Jordon told Smith that they were investigating counterfeit being passed to stores. Smith admitted to Agent Jordon that the money was counterfeit and that he had won it "shooting dice." Smith then

---

[4]A total of $170.00 was removed from Smith's pants pocket. It was later determined that $87.00 in genuine currency was commingled with counterfeit bills.

gave Agent Jordon consent to search his car. Smith's car was searched and several receipts for cash transactions were recovered.

The agents transported Smith and Hinton in separate cars to the Secret Service office. At the office, the agents learned that Smith was a convicted felon and was on supervised release with the U.S. Probation Office. The agents placed Smith and Hinton in separate interview rooms. Before questioning Smith, Agent Jordon provided Smith with a rights waiver form that contained <u>Miranda</u> warnings, he read the <u>Miranda</u> warnings out loud to Smith, and Smith signed the form. Smith then agreed to give a statement. He again stated that he won the counterfeit money shooting dice, but then changed his story and said that he bought the counterfeit money from someone named "Richy Rich" who lived in the area. Smith said that he would be willing to cooperate with the agents to set up an undercover purchase of counterfeit money. Smith admitted that he had attempted to pass counterfeit money at Casual Male and that he had provided Hinton with the counterfeit money that she attempted to use at Stein Mart. After Smith made these oral statements, he provided Agent Jordon with the following written statement, which Smith signed and dated:

> I purchased the counterfeit money from a guy by the name Richy Rich. We normally meet once a week at a park on Lamar & Prescott. He drives a white Cadillac. Agent William Jordon has informed me that by me cooperating with him I will be given some cooperation in return.

(5/11/10 Hearing Ex. 2.)[5]   Agent Jordon told Smith that if he worked as an informant, Agent Jordon would advise the U.S. Attorney's Office that Smith had cooperated in the investigation. However, Agent Jordon did not promise Smith that he would be permitted to be an informant, as Agent Jordon knew it would be difficult to use someone currently on supervised release as an informant.   Moreover, Agent Jordon never promised Smith that if he cooperated, he would not be prosecuted.   Agent Jordon only told Smith that the prosecutor would be notified of any cooperation he provided.

While Smith was being questioned in one room, Special Agents Jeffrey Barker and Sonny Low interviewed Hinton in a separate room. The agents provided Hinton with a rights waiver form that contained <u>Miranda</u> warnings, they read the <u>Miranda</u> warnings out loud, they had her read the warnings back to them, and she signed the form waiving her rights.   She then told the agents that she and Smith had attempted to use counterfeit money to purchase merchandise at Casual Male and Stein Mart.   She stated that a girlfriend of Smith's who had recently been released from jail showed him how to print counterfeit money and that Smith had purchased a printer to make counterfeit.   Hinton said that she (Hinton) and Smith lived together in an apartment together, that Smith printed counterfeit money at the apartment and she helped him, and that they sold the

---

[5]The written statement also contained <u>Miranda</u> warnings.

counterfeit.  During this time, Hinton was cooperative with the agents, she was not threatened in any way, she was not handcuffed, and she was not promised anything by the agents other than that the prosecutor would be notified of her cooperation.

Hinton then gave the agents consent to search the apartment, and she executed a written consent form.  The form stated that she gave the agents consent to "conduct a complete search of the premises" and that the agents "are authorized by me to take from the premises . . . any letters, papers, materials or other property which is contraband or evidence in the nature of counterfeit.  I understand that this contraband or evidence may be used against me in a court of law."  (5/11/10 Hearing Ex. 6.)  The consent form further provided that "[t]his written permission is being given by me to the above named persons voluntarily and without threats, duress, or promises of any kind."[6]

Shortly thereafter, Agents Barker and Low drove Hinton to the apartment.[7]  When they arrived, the agents used Hinton's key to gain access to the apartment.[8]  During the search, the agents found

---

[6]Because Hinton did not know the exact address of the apartment, the agents did not fill in the address on the form until after they arrived at the apartment.

[7]On the way there, Hinton asked the agents what would happen if she took responsibility for printing the counterfeit.  Agent Low asked her why should would want to do that, to which she responded that she loved Smith.

[8]Agents Barker, Low, Stutheit, and Davis participated in the search of the apartment.

large sheets of uncut counterfeit money, a printer, paper cutters, genuine currency that had been bleached, and several other items associated with the production of counterfeit.  While searching a bedroom that Hinton stated she and Smith shared, agents recovered a loaded Smith and Wesson .38 caliber revolver.  The revolver was found underneath a mattress that was lying on the floor.  The revolver was partially protruding from underneath the mattress, and the agents saw the revolver prior to lifting the mattress, taking a photograph, and seizing the firearm.  In the living room, the agents found a box of ammunition.  At no time during the search did Hinton indicate to the agents that they were not permitted to search in a given area, nor did she attempt to revoke her consent to search.

At the apartment, Hinton provided a signed, written statement:

> Bobby use to go with this girl named Shawn, she showed him how to clean money and print it on, and she taught him how to print money.  So when she got out she contacted him a week ago and started cleaning some for him.  Bobby bought a printer and tryed [sic] to do it. It just seemed so easy to get what you need not <u>want</u>. Money is such a problem these days.  We went to Casual Men and Steinmart both of them didn't take the paper so we gave them real money.  I work a job that only pays me $2.13 p/hr it's very hard transportation to Collierville is hard, back and forth.  I'm just so use to Bobby, please don't take him away I showed you and gave you all that you needed.

(5/11/10 Hearing Ex. 8.)

Smith and Hinton were indicted on June 26, 2008 on four counts of making counterfeit money, in violation of 18 U.S.C. § 471, and

four counts of possessing and concealing counterfeit money, in
violation of 18 U.S.C. § 472.  Smith was also indicted on one count
of being a felon in possession of a firearm and one count of being
a felon in possession of ammunition, both in violation of 18 U.S.C.
§ 922(g).  A Superseding Indictment charged Smith and Hinton with
one count of conspiracy, and one count each of making counterfeit,
attempting to pass counterfeit, and possessing and concealing
counterfeit.  A Second Superseding Indictment added Smith's mother,
Dannette Ross, as a defendant, and charged Smith, Hinton, and Ross
with conspiracy to corruptly influence or impede an official
proceeding and attempting to influence or impede an official
proceeding, in violation of 18 U.S.C. § 1512(c)(2).[9]

        In his memorandum in support of his motion to suppress, Smith
makes numerous factual allegations, including alleging that: (1)
Hinton was coerced into giving a statement and granting consent to
search the apartment based on promises by the agents that neither
she nor Smith would be arrested or prosecuted if she cooperated;

---

[9]The obstruction charges are based on allegations that Smith,
Hinton, and Ross conspired to have Hinton file a false affidavit
claiming sole responsibility for counterfeiting money and
possession of the items seized from the apartment.  The charges
further allege that the false affidavit was provided to Smith's
former attorney, who was unaware that the affidavit was false.
Subsequently, after a hearing before the district judge, the court
ordered Smith's former attorney to turn over the affidavit to the
government.  In his motion to suppress, Smith argued that the
court's order violated Smith's Fifth Amendment rights.  However, at
the suppression hearing, counsel for Smith stated that he was
withdrawing this Fifth Amendment argument and thus was no longer
seeking suppression of the affidavit.

(2) Smith initially told Agent Jordon that he denied knowing the money was counterfeit; (3) agents specifically told Hinton that she and Smith would be released if she could provide them with the printer used to make the counterfeit money or provide them with additional counterfeit; (4) Hinton was ordered by the agents to sign the consent to search form; (5) Hinton was not given her <u>Miranda</u> warnings before making her statements; and (6) when Hinton saw that the agents were continuing their search of the apartment even after they seized the printer, she asked, "Why are you destroying my things and going through my stuff?", to which the agents allegedly replied, "Shut the [expletive] up, sit down, and finish writing that statement."   The court submits that none of these allegations are supported by any evidence in the record.[10]

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Parking Lot Arrest

---

[10]In an attempt to show that the agents made false promises to Hinton in order to obtain her consent to search, Smith introduced at the suppression hearing two CDs containing recorded telephone conversations he had with Hinton and Ross while he was in jail on these charges.  During two conversations, Hinton told Smith that she cooperated with the agents because they promised her that they would let Smith go and that the agents "tricked" her.  The court does not find that this evidence credibly supports Smith's claim. In other recorded conversations, Smith and Ross can be heard berating Hinton for cooperating with the agents and showing them the apartment.  The court believes that Hinton, in an attempt to explain her "betrayal" to Smith, made up an excuse for why she cooperated with the agents.  Hinton's lack of candor with Smith was revealed in another recorded conversation, in which she lied to Smith and told him that she did not tell the agents that Smith was involved in counterfeiting.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."[11]  U.S. Const. amend. IV.  It is well established that the level of suspicion required to justify an investigatory stop or detention is "reasonable suspicion." Terry v. Ohio, 392 U.S. 1, 3 (1968); United States v. Heath, 259 F.3d 522, 528 (6th Cir. 2001).  "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity . . . .  Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).  For purposes of determining whether reasonable suspicion exists, the Supreme Court has instructed that a reviewing court must consider the "totality of circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).  The Court further instructed that in considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of

_____

[11]It is not entirely clear from Smith's motion whether he seeks to challenge his stop and arrest in the Stein Mark parking lot. Nonetheless, the court will address the constitutionality of his arrest before analyzing the arguments that are more clearly raised in his motion.

them taken together give rise to reasonable suspicion that criminal activity may be afoot.  Id. at 274-75.

In the present case, the agents had reasonable suspicion to conduct a Terry stop of the defendants.  The agents received information from Stein Mart and Casual Male employees that a man and woman had attempted to use counterfeit money at the stores and that, according to Stein Mart's loss-prevention personnel, the couple had come back to Stein Mart to return some merchandise. When Agent Davis arrived at Stein Mart, an employee identified Smith and Hinton to Agent Davis as the individuals who had attempted to pass the counterfeit.  Based on this information, the agents had reasonable suspicion to stop Smith and Hinton in the parking lot.

Upon approaching Smith, the agents were permitted to conduct a Terry frisk to check for weapons for officer safety, based on Smith's statement that he had a knife in his pants pocket.  United States v. Walker, 181 F.3d 774, 778 (6th Cir. 1999) ("[D]uring a Terry stop, a police officer may conduct a limited search for concealed weapons, if the officer believes that a suspect may be dangerous."); United States v. Roach, 958 F.2d 679, 682 (6th Cir. 1992) ("Once a lawful stop pursuant to the Terry doctrine occurs, a frisk or partial search, consisting of a police officer's 'pat down' of a person's outer garments, is permissible where it appears from the facts known to the officer that there is a reasonable

likelihood that the restrained individual is armed and the
officer's safety is in jeopardy."). During the frisk, Agent Davis
felt a wad of cash in Smith's other pocket. Based on the
information known to Agent Davis at the time, the agent had
probable cause that the item in "plain touch" was incriminating
evidence.[12]   Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)
(finding that officers may seize contraband other than weapons
during a Terry frisk if the officer "feels an object whose contour
or mass makes its identity immediately apparent"). Agent Jordon
examined the cash and immediately recognized that some of the bills
were counterfeit, thus giving the agents probable cause to arrest
Smith and Hinton.[13]   See United States v. Torres-Ramos, 536 F.3d

---

[12]While Agent Davis did not testify specifically about his personal
observations when he felt the wad of cash in Smith's pocket, it is
reasonable to believe that a Secret Service agent investigating a
person for passing counterfeit would immediately recognize the feel
of a wad of cash in the person's pocket and believe that it was
incriminating evidence. In United States v. Bustos-Torres, 396
F.3d 935 (8th Cir. 2005), an officer observed what he believed to
be a drug transaction, and as he conducted a Terry frisk of
defendant Alfaro for weapons, the officer came across two wads of
bills in Alfaro's pockets, which the officer seized. On appeal,
the Court of Appeals considered whether the officer had probable
cause to seize the money, that is, whether the bills, by their mass
and contour, were immediately identifiable to the officer's touch
as incriminating evidence. The court, "[p]ondering the question
with a dose of common sense," held that the officer had probable
cause to seize the money based on his prior observation of a
possible drug transaction and the large number of bills in Alfaro's
pockets. Id. at 945.

[13]Although Agent Davis drew his firearm during the Terry stop and
ordered the defendants out of the car, and Agent Jordon pulled
behind Smith's car and activated his lights and siren, these acts
did not elevate the Terry stop to an arrest. United States v.

542, 555 (6th Cir. 2008) (stating that in order to determine if an officer had probable cause to arrest a defendant, the court must determine "whether, at the time of the arrest, the facts and circumstances within the arresting officer's knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person to conclude that an individual either committed or was committing an offense") (quoting <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964)) (internal quotation marks omitted); <u>see also</u> <u>United States v. Evans</u>, 581 F.3d 333, 342 (6th Cir. 2009) (quoting <u>United States v. Strickland</u>, 144 F.3d 412, 416 (6th Cir. 1998)) ("Probable cause requires officers to 'show more than mere suspicion' but 'does not require that they possess evidence

---

<u>Donaldson-Pinilla</u>, 292 F. App'x 217, 218-19 (4th Cir. 2008) (stating that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for <u>Miranda</u> purposes") (internal citation and quotation marks omitted); <u>United States v. Lee</u>, 317 F.3d 26, 31-32 (1st Cir. 2003) (finding that officer was justified in drawing his firearm on a defendant suspected of credit card fraud because it was for security reasons and "actions such as unholstering a weapon and obstructing a vehicle's path do not, as a matter of law, transmogrify an otherwise lawful <u>Terry</u> stop into a *de facto* arrest"). However, even if Smith's stop could be construed as an arrest, the court submits that the agents had sufficient probable cause to arrest Smith based solely on the telephone calls Agent Jordon received from the Casual Male store manager and the Stein Mart loss-prevention employee, and the positive identification made by the Stein Mart employee. In that case, the agents would have been authorized to search Smith's person and seize the counterfeit money as a search incident to an arrest. <u>Arizona v. Gant</u>, 129 S. Ct. 1710, 1716 (2009). As for the subsequent search of Smith's car, he gave the agents consent to search, and Smith does not challenge the voluntariness of his consent or the scope of the agents' search in his Motion to Suppress.

sufficient to establish a prima facie case at trial, much less
evidence to establish guilt beyond a reasonable doubt.'"); United
States v. Lopez, No. 2:08-CR-94, 2009 WL 982777, at *2 (E.D. Tenn.
Apr. 13, 2009) ("'Probable cause is a fluid concept – turning on
the assessment of probabilities in particular factual contexts –
not readily, or even usefully, reduced to a neat set of legal
rules.'") (quoting Illinois v. Gates, 462 U.S. 213, 232 (1976)).

**B.   Post-Arrest Statements**

   Next, Smith argues that Hinton's post-arrest statements and
his own post-arrest statements should be suppressed.[14]  Assuming,
arguendo, that Smith has standing to challenge the voluntariness of
Hinton's statement, see United States v. Salvucci, 448 U.S. 83, 86-
87 (1980); Rakas v. Illinois, 439 U.S. 128, 133-34 (1978); Martinez
v. United States, No. 05-1146-CV-W-DW-P, 2006 WL 1041140, at *1
(W.D. Mo. April 13, 2006), the court finds that both Smith's and
Hinton's statements were made voluntarily.

   Under the Due Process Clause of the Fifth Amendment, exclusion
is required if statements are elicited by means of physical or
psychological police coercion which, under the totality of the
circumstances, is such as to overbear a defendant's will to resist.
Dickerson v. United States, 530 U.S. 428, 433-34 (2000).  To find

---

[14]Although Smith argues in his motion that Hinton's statements
should be suppressed, it is unclear whether he seeks suppression of
his own post-arrest statements.  The court will give Smith the
benefit of the doubt and address whether his statements should be
suppressed.

a confession involuntary due to police coercion, a court must find
that (1) the police activity was objectively coercive; (2) the
coercion was sufficient to overbear the defendant's will; and (3)
the police misconduct was the crucial motivating factor in the
defendant's decision to offer the statement.  United States v.
Johnson, 351 F.3d 254, 260 (6th Cir. 2003) (citing United States v.
Mahan, 190 F.3d 416, 422 (6th Cir. 1999)).  When a defendant
contends that a confession or statement was coerced, the government
must show by a preponderance of the evidence that the confession
was voluntary.  Id.  Relevant factors in the court's determination
include the defendant's age, education, and intelligence; whether
the defendant was informed of his constitutional rights; the length
and extent of the questioning; and the use of any physical
punishment.  Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir.
1994).

Both Smith and Hinton were read their Miranda rights, there is
nothing in the record to suggest that they did not understand their
rights, and they gave their statements only after waiving their
rights.  As discussed in the Proposed Findings of Fact, none of the
agents engaged in conduct that was coercive, and other than telling
the defendants that their cooperation would be reported to the
prosecutor, the agents did make any promises or threats.[15]  United

_____

[15]When Smith was placed in Agent Jordon's car in the Stein Mart
parking lot, Agent Jordon told Smith that he was investigating
passing of counterfeit at the stores, and Smith stated that the

-16-

States v. Wiley, 132 F. App'x 635, 640 (6th Cir. 2005) (finding
promises that cooperation would be communicated to prosecutors "do
not, *ipso facto*, render a confession coerced . . . even when the
promise to inform the prosecutor is accompanied by a promise to
request leniency or by speculation that cooperation will have a
positive effect") (internal citation and quotation marks omitted)
; United States v. Coleman, 208 F.3d 786, 791 (9th Cir. 2000)
(finding confession voluntary because promise to tell prosecutor
about cooperation does not establish involuntariness); United
States v. Dillon, 150 F.3d 754, 758 (7th Cir. 1998) (finding
confession voluntary despite agent's promise to bring defendant's
cooperation to prosecutor's attention); United States v. Broussard,
80 F.3d 1025, 1034 (5th Cir. 1996) (finding confession voluntary
even though officer promised to make defendant's cooperation known
to U.S. Attorney's Office); United States v. Ruggles, 70 F.3d 262,
265-66 (2d Cir. 1995) (finding confession voluntary despite promise
of leniency if defendant cooperated with law enforcement
officials). Here, the agents' statements regarding informing the
prosecutor about the defendants' cooperation simply do not rise to

---

money was counterfeit and that he had won it shooting dice.
Although Smith was in custody at the time he made this statement,
the statement was not made in response to police interrogation and
thus should not be suppressed. Rhode Island v. Innis, 446 U.S.
291, 301 (1980); United States v. Ortkiese, 208 F. App'x 436, 440
(6th Cir. 2006); United States v. Jones, 128 F. App'x 490, 494 (6th
Cir. 2005); United States v. Cole, 315 F.3d 633, 636 (6th Cir.
2003); United States v. Murphy, 107 F.3d 1199, 1205 (6th Cir.
1997).

the level of an irresistible inducement so as to overbear the defendants' will.  <u>See</u> <u>United States v. Barrena</u>, No. 1:07-CR-66, 2007 WL 5312565, at *12 (E.D. Tenn. Dec. 28, 2007).  Thus, the Motion to Suppress the post-arrest statements should be denied.

**C.   Search of the Apartment**

The court next addresses whether the warrantless search of Smith and Hinton's apartment violated the Fourth Amendment.[16] "[O]ur analysis begins . . . with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions.'"  <u>Gant</u>, 129 S. Ct. at 1716; <u>United States v. Radka</u>, 904 F.2d 357, 360 (6th Cir. 1990).  "Those exceptions include automobile searches, consented-to searches, searches incident to arrest, seizures of items in plain view, <u>Terry</u> stops, the hot-pursuit rule, and searches in order to prevent the loss or destruction of evidence."  <u>Reynolds v. City of Anchorage</u>, 379 F.3d 358, 370 (6th Cir. 2004).

---

[16]The court finds that, based on Smith's testimony at the suppression hearing, he had a reasonable expectation of privacy in the apartment and therefore may challenge the search.  <u>United States v. Washington</u>, 573 F.3d 279, 282-83 (6th Cir. 2009).  Although the apartment lease was in Hinton's name, Smith paid the first two months of rent, he regularly stayed overnight at the apartment, he stored half of his clothes at the apartment, and he kept his personal property there, including his PlayStation video game system and his printer.  Also, when the agents searched the apartment, they found his driver's license in the bedroom.

The agents obtained consent to search the apartment from Hinton. "If an officer obtains consent to search, a warrantless search does not offend the Constitution." United States v. Moon, 513 F.3d 527, 537 (6th Cir. 2008) (citing Davis v. United States, 328 U.S. 582, 593-94 (1946)). "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).

Smith argues that Hinton's consent was not voluntary. The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion . . . is a question of fact to be determined from the totality of all the circumstances." Bustamonte, 412 U.S. at 227. "To determine if consent was voluntary, a court must look at the totality of the circumstances and examine the following factors: 'the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.'" United States v. Ables, 280 F. App'x 513, 516 (6th Cir. 2008) (quoting United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999)) (internal citation omitted). Hinton was cooperative with the agents the entire time; she was not handcuffed; she voluntarily agreed to show the agents where the

-19-

apartment was located; she verbally consented to the search of the apartment and subsequently signed the consent form after waiving her <u>Miranda</u> rights and giving a confession; she gave the agents her key in order to access the apartment; and she never revoked her consent or took any action inconsistent with her intent to let the agents search the apartment. As mentioned above, the agents did not engage in any conduct that could be construed as coercive. Under the totality of the circumstances, the court finds that Hinton's consent was voluntary.

Smith next argues that his consent to search the apartment was required in addition to Hinton's consent. "[A] search is not unreasonable if an individual with a privacy interest in the [premises] to be searched gives voluntary consent." <u>United States v. McCauley</u>, 548 F.3d 440, 446 (6th Cir. 2008) (citing <u>Bustamonte</u>, 412 U.S. at 219). "Valid consent may be provided not only by the defendant but also by 'a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" <u>Id.</u> (quoting <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974)). Hinton, as the leaseholder and primary tenant, had actual authority to give the officers consent to search her apartment, including the bedroom she shared with Smith. <u>Moon</u>, 513 F.3d at 537 (citing <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548 (1968); <u>see also United States v. McCaleb</u>, 552 F.2d 717, 721 (6th Cir. 1977).

In <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006), the police searched a house with the permission of one occupant, even though another occupant who was physically present at the scene expressly refused consent.   The Supreme Court explained that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him."  <u>Id.</u> at 106.   However, the Court was careful "to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out."  <u>Id.</u> at 121.   Because Smith was at the Secret Service office and not even aware that the agents were searching the apartment – and therefore could not have possibly objected to the search – <u>Randolph</u> does not apply.   <u>See United States v. Robinson</u>, No. 3:06-CR-176, 2007 WL 1959156, at *10 (E.D. Tenn. July 2, 2007) (finding that <u>Randolph</u> "confirmed that when two persons share access to or control over an area, either or both may validly consent to a search," and that under <u>Randolph</u>, "the consent by the Defendant's mother and van's registered owner would be valid because the Defendant was neither present nor objected to the consent to search").   Therefore, the agents did not violate Smith's Fourth Amendment rights by searching the apartment without obtaining his consent.

-21-

Finally, Smith argues that the agents exceeded the scope of Hinton's consent when they seized the revolver from underneath the mattress.   The court disagrees.   The agents were authorized to search in places where any evidence of counterfeiting could be found, which included the bedroom and underneath the mattress, as counterfeit money could have been easily hidden in those places. At the time the agents searched the apartment, they knew that Smith was a convicted felon and currently on supervised release, and that it was illegal for him to be in possession of a firearm.   Once they saw the gun in plain view, the criminal nature of the evidence was immediately apparent, and thus they could lawfully seize it.[17] United States v. Flores, 193 F. App'x 597, 605 (6th Cir. 2006) (finding that knowledge that defendant was a convicted felon gave the officers the right to seize gun).   Therefore, the Motion to Suppress should be denied as to the search of the apartment.

### III.   RECOMMENDATION

For the reasons above, it is recommended that the Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

August 16, 2010
Date

---

[17]Smith's motion makes no mention of the ammunition found in the apartment.

NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).   FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**